Opinion issued
August 25, 2011 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 

 
 


 

 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 


 
 

 
 



NO. 01-10-00855-CV

 


 
 

 
 



FRED KETTRICK AND JUDY KETTRICK, Appellants

 

V.

 

LUANNE APPEL COLES, Appellee

 


 
 

 
 
 



On Appeal from the 335th District Court

Washington County, Texas

Trial Court Cause No. 33,873

 


 
 

 
 
 



MEMORANDUM
OPINION

Appellants, Fred and Judy Kettrick, challenge
the trial court’s entry of judgment, after a bench trial, in favor of appellee,
Luanne Appel Coles, in Coles’s suit against the Kettricks for breach of a Rule
11 Agreement (the “Rule 11 Agreement”).[1]   In two issues, the Kettricks contend that the
trial court erred in concluding that their former attorney, Steven Haley, had
actual and apparent authority to bind them to the Rule 11 Agreement.    

We affirm.    

Background

          In
2007, Coles filed her original petition, seeking to partition a forty-four acre
tract of land, located in Independence, Texas and which she co-owned with the
Kettricks, Rhonda and Greg Cupit,[2]
and Evelyn Tate.[3]  The Kettricks filed a counterclaim for
contribution, alleging that they had expended labor and money for improvements
to the property over the course of their ownership.  

On May 1, 2009, the trial court
entered a “Decree Ordering Partition in Kind, Appointing Surveyor and Special
Commissioners, and Determining Contribution Claims.”  In its decree, the trial court found that the
Kettricks owned 23.2% of the surface interest and 23.2% of the mineral interest
in the property, Coles owned 38.4% of the surface interest and 38.4% of the
mineral interest in the property, the Cupits owned 38.4% of the surface
interest in the property, and Tate owned 38.4% of the mineral interest in the
property.  It also found that the
property should be partitioned into separate tracts proportionate to the value
of each party’s interest, and it appointed a surveyor and three special
commissioners to partition the property. 
The trial court further found that Fred Kettrick had a contribution
claim in the amount of $31,875 and Coles had a contribution claim in the amount
of $14,976, but it deferred entering a contribution award.  

          On
August 7, 2009, the commissioners filed their report (the “Commissioners’
Report”), in which they divided the property into three separate tracts and recommended
awarding a 13.332 acre tract to Fred Kettrick, a 12.442 acre tract to Coles,
and a 18.570 acre tract to Rhonda Cupit. 
The commissioners attached to their report exhibits depicting the
location of these tracts, and the exhibits indicated that Coles’s tract
contained two houses, referred to by the parties as the “Spring  House” and the “Old House,” that were located
on the property.  All parties filed an
agreed objection to the Commissioners’ Report on the ground that the report
failed to account for the mineral estate. 
The Kettricks, the Cupits, and Tate also filed objections to the Commissioners’
Report on the grounds that it did not represent a fair and equitable partition
of the property and it did not account for the Kettricks’ contribution credits.  The Kettricks, the Cupits, and Tate requested
that the trial court reject the report and set the matter for jury trial.    

          It
is undisputed that on March 9, 2010, prior to trial, Coles, who was represented
by her lawyer, Josh Clover, and Fred Kettrick and Rhonda Cupit, who were
represented by their lawyer Steven Haley, met at Haley’s office for settlement
discussions.  Following the meeting, the
parties traveled to the property, where they further discussed the partition of
the property.  However, the parties
dispute whether they had agreed to settle the case while at the property. 

          On
March 10, 2010, Clover sent Haley a letter, which was entitled “Rule 11
agreement,” in which he stated,

After yesterday’s settlement conference and inspection
of the real property the subject of the above referenced partition suit, the
parties have agreed to settle.  In order
to effectuate this agreement, the parties will execute a Compromise Settlement
Agreement in substantially the same form as the document attached hereto as
Exhibit I and containing the following material terms:

 

(1)     The real property
the subject of this suit will be partitioned in the manner directed in the
Report of Commissioner’s filed with the Court on August 7, 2009, with the
following exceptions:

 

a)       Fred Kettrick
will additionally have partitioned to him a parcel containing the Spring House
with the boundaries delineated on Exhibit B to Exhibit I attached hereto; and,

 

b)      Mrs.
Coles will additionally have partitioned to her a parcel (i) bordering FM 390;
(ii) adjacent to the western boundary of the tract already partitioned to her;
(iii) equal in acreage to the parcel additionally partitioned to Fred Kettrick
in paragraph I) a) above; and, (iv) with the boundaries delineated on Exhibit C
to Exhibit I attached hereto.

 

(2)     John
Pledger will be engaged in order to conduct the additional survey work
necessary to properly describe by metes and bounds, the additional parcels described
in paragraph I) above.

 

(3)     Mrs.
Coles will pay 50% of the cost of Mr. Pledger’s additional survey work, and
Fred Kettrick and the remaining Defendants will pay 50% of the cost of Mr.
Pledger’s additional survey work.

 

(4)     Fred Kettrick
and the remaining Defendants will have until June 1, 2010 to remove all personal
property from the tract partitioned to Mrs. Coles.  After June 1, 2010, any personal property left
on the tract, or in improvements located on the tract partitioned to Mrs.
Coles, will be considered abandoned, and Mrs. Coles may keep or dispose of it
at her sole discretion.

 

If this accurately sets forth our agreement, please
sign below and return a copy to me.

 

Clover attached to this letter a copy
of an unexecuted “Compromise Settlement Agreement,” which provided that the
parties would submit an agreed judgment to the trial court containing those
terms set forth in the Rule 11 Agreement. 


Haley, also on March 10, 2010, signed
the Rule 11 Agreement on behalf of the Kettricks, the Cupits, and Tate.  Haley, also on that same day, sent Fred
Kettrick, Rhonda Cupit, and Tate a letter enclosing the “proposed Compromise
Settlement Agreement formalizing the agreement of the Parties in settling the
above matter.”  Haley instructed his
clients to “look this over” and, “[i]f okay,” to sign and return it” or to “[c]all
with any questions.”  Haley also asked Fred
Kettrick, Rhonda Cupit, and Tate to note that there was a June 1 deadline to
remove any personal items from the property awarded to Coles, and Haley stated
that he needed Fred Kettrick to pay one-half of the surveyor cost for surveying
“the two small tracts created by this settlement.”

The Kettricks and the Cupits did not execute
the Compromise Settlement Agreement, and a dispute arose between the Kettricks
and Haley over the Rule 11 Agreement.  On
March 25, 2010, Haley withdrew as counsel for the Kettricks, the Cupits, and
Tate, and they, now represented by Stephen Moon, their new attorney, filed in
the trial court a “Verified Withdrawal of Consent for Rule 11 Agreement and
Request for Jury Trial on Defendants’ Objection to Report of
Commissioners.”  In this document, the
Kettricks, the Cupits, and Tate stated that the Rule 11 Agreement had been
signed by Haley without their knowledge, consent, or authorization, and they
revoked their consent to the Rule 11 Agreement.

Coles filed an amended petition,
alleging a claim for breach of contract arising from the refusal to comply with
the Rule 11 Agreement, which she filed with the trial court.[4]  The trial court subsequently conducted a
bench trial on Coles’s breach of contract claim.[5]  

At trial, Coles testified that she
and her husband, with Clover, met with Fred Kettrick, Rhonda Cupit, and Haley
at his office, and they all devised “a plan to settle” the dispute.  Coles explained that both the Spring House
and the Old House were located on the tract to be awarded to her in the
Commissioners’ Report.  As part of the settlement,
Coles agreed to give up the Spring House and one or two surrounding acres in
exchange for an equal amount of acreage on the Kettricks’ tract.  After coming to this proposed agreement in Haley’s
office, the parties, along with their attorneys, drove to the property, where
Fred Kettrick “showed [them] what he wanted” around the Spring House.  Coles and her husband agreed to this request.  In regard to the acreage to be added to her
tract, Coles explained that although the parties had agreed at Haley’s office to
add this acreage “by taking it off the western side,” the parties subsequently
agreed that she would instead receive an area of land, which she referred to as
the “rock pile,” on the front of the Kettricks’ tract.  Coles stated that she did this as an
accommodation to Rhonda Cupit, who “wanted the pasture land” for her horses.  Coles believed that all the parties had
agreed to these terms and that all parties understood that the actual
boundaries “would have to be confirmed by the . . . surveyor.”  Coles reviewed the Rule 11 Agreement and
confirmed that it accurately represented the agreement reached by the parties
at the property after two to three hours of settlement discussions. 

On cross-examination, Coles stated that
she did not know whether the parties had discussed the provision in the Rule 11
Agreement regarding the removal of the personal items from the property during their
settlement discussions, but she explained that she assumed that “whoever got
the house would get the remaining furniture.” She also stated that the parties had
“already divided it.”  When asked if she
had taken any steps “in reliance” upon the Rule 11 Agreement, Coles stated that
she “couldn’t do that because it wasn’t legally divided to [her]” at that time.  She also agreed that she had not tried to
sell the property.

Fred Kettrick testified that on March
9, 2010, he, Rhonda Cupit, Coles, Coles’s husband, Haley, and Clover met at
Haley’s office to try to settle the dispute. 
After over an hour at the office, the parties traveled to the
property.   Kettrick agreed that at this
time, he thought there was “possibly” an agreement, the terms of which would
include his receipt of the Spring House and some surrounding acreage and Coles’s
receipt of some acreage on the western boundary of her tract.  When asked about whether the “same acre or
two” would be added to Coles’s property, Kettrick agreed that this was
“contemplated” before visiting the property, but this ultimately is how the
deal “fell apart.”  The parties walked
the property and agreed to boundaries around the Spring House, but a dispute
developed over Coles’s “makeup acreage.” 
Kettrick stated that he “didn’t care to give [Coles] anything for the
acreage around the Spring House.”  When
asked if he had participated in the discussions about adding the “rock pile”
land, Kettrick denied that any such discussion occurred.  He agreed that, at the conclusion of the
parties’ visit to the property, Coles “probably” understood that the parties
had reached a settlement and he did not say anything “to make [Coles] think that
the case hadn’t been settled.”  Kettrick also
understood that Haley believed that the case had been settled, but he did not
speak to Haley after they had visited the property.  

Later on the same day that the
parties had visited the property, Kettrick asked Rhonda Cupit to call Haley to
tell him not to enter into a settlement agreement and complain that the survey
lines on the property were incorrect.  Kettrick
agreed that he did not have personal knowledge about the subsequent phone
conversation between Rhonda Cupit and Haley. 
When asked why he had not raised any complaints while at the property
about the additional acreage to be given to Coles, Kettrick said, “I don’t
know.”  

Kettrick explained that he did not
realize that Haley had signed the Rule 11 Agreement until he had later met with
his new attorney.  Kettrick explained
that he did not authorize Haley to sign the Rule 11 Agreement, the parties had
never discussed the provisions in the Rule 11 Agreement about the additional
survey work or the removal of personal items from the property, and Haley and
Clover must have taken it “upon themselves” to insert those provisions into the
Rule 11 Agreement.  He denied making any
statements suggesting that the parties had reached a settlement or any representations
that Haley was authorized to sign a Rule 11 Agreement.  Kettrick understood that, after leaving the
property, the attorneys were “going to draw some papers up,” but he maintained
that he had not authorized Haley to sign any settlement papers.  

Haley testified that after several
hours of settlement discussions at Haley’s office, Fred Kettrick, Rhonda Cupit,
and the Coles agreed to settle the case by adopting the Commissioners’ Report,
but with some exceptions.  The parties
agreed that Fred Kettrick would receive the Spring House and some surrounding acreage
and Coles, in exchange, would receive acreage from the Kettrrick tract.  The parties then traveled to the property,
where, over the course of two hours, everyone agreed to the boundaries around
the Spring House and the makeup acreage, which was a triangular piece of land.  Haley stated that Fred Kettrick and Rhonda
Cupit confirmed that this was their agreement. 
Specifically, Haley had asked Fred Kettrick if he “would agree to the
proposal that was then before the parties,” and Fred Kettrick affirmed.  Haley was “convinced [his] clients had agreed
to what was in there.”  

Later that day, Haley received a telephone
call from Rhonda Cupit, who told him that she and Fred Kettrick were concerned
about the location of some of the surveying pins on the property.  Haley did not think that Rhonda Cupit’s
concern substantively affected the terms of the settlement, and she did not
tell Haley that the “deal had changed or that [she or Fred Kettrick] had
changed their mind.”  Haley explained that
he signed the Rule 11 Agreement because there “was some necessity to act while
Mrs. Coles was still agreeing,” and he only learned, some “weeks later,” that
Kettrick disputed the Rule 11 Agreement and would not sign the Compromise and
Settlement Agreement.  

On cross-examination, Haley stated
that it is normal to negotiate settlements for “husband and wife” when one
spouse is not present, and he explained that Tate would have been unaffected by
the Rule 11 Agreement because she was only a mineral interest holder.  Haley agreed that he did not specifically
discuss the Rule 11 Agreement with his clients or inform them that he would be
signing the agreement on their behalf. He also agreed that his clients had not given
him “affirmative authorization” to sign the Rule 11 Agreement.  However, Haley maintained that there was “no
indication” in Rhonda Cupit’s telephone call after the purported settlement
that either she or Fred Kettrick were “unhappy with or desiring to distance
themselves from the previous agreement.”

Haley explained that the Rule 11 Agreement
was “an attempt to be a shorthand rendition of the follow along Compromise [and]
Settlement Agreement.”  When asked if the
parties had discussed the third and fourth provisions of the Rule 11 Agreement,
which concerned the payment of additional surveying fees and the removal of
personal items from the property, Haley stated that there “was some discussion
of [the survey fees], but certainly no discussion of [the removal of personal items].”  However, he explained that there was “already
a deal” regarding the personal items and this provision of the Rule 11
agreement provided an extension of time to remove the items.  Haley agreed that he did not call his clients
upon receiving or signing the Rule 11 Agreement, but he noted that he did send his
clients a letter.  

Haley did not see any “material differences”
between the Rule 11 Agreement and the Compromise Settlement Agreement, but he
agreed that the percentages of payment for the additional survey work contained
in the Rule 11 Agreement were not discussed at the property and these percentages
“were proposed by Coles and seemed like a good deal to [him] since [his
clients] owned considerably more in terms of percentage of the property than
she did.”  Haley acknowledged that a “few
minutes” before leaving the property, he informed Fred Kettrick and Rhonda Cupit
that Coles had refused to agree to their request for a right of first refusal
on the sale of her property, but he did not think that this term was a “deal
killer.” 

Rhonda Cupit testified that she did
not realize that Haley had signed the Rule 11 Agreement until several days after
the parties had met at the property and she did not authorize Haley to sign the
Rule 11 Agreement.  On March 9, 2010,
while at the property, she did not think that the survey “lined up”
correctly.  Cupit denied that the parties
had discussed the provision regarding the payment for the survey work and,
although she agreed that there was some discussion about the removal of
personal items, she stated that the parties had not discussed this in any detail.  Following the parties’ visit to the property,
she called Haley and told him that Fred Kettrick was “very upset” and that the
survey lines were not correct.  Cupit
also stated that she had asked Haley to obtain a right of first refusal on the
property from Coles, this term had been “an issue the whole time,” and she
would not have entered into a settlement agreement that lacked a right of first
refusal.  

On cross-examination, Cupit stated
that the parties had not agreed to anything, but had only discussed how they
might reach an agreement. Cupit noted that, at the conclusion of the property
visit, the parties got into an argument concerning the fact that Fred Kettrick was
not receiving anything on his contribution claim. 

After the trial, the trial court
entered final judgment in favor of Coles on her claim for breach of
contract.  The trial court ordered that
the property be partitioned in the manner directed in the Commissioners’
Report, with the exceptions that, in accord with the Rule 11 Agreement, the
Kettricks would receive a tract containing the Spring House with some
surrounding acreage and Coles would receive, in return, a tract equal in
acreage.  The trial court included in its
judgment diagrams depicting these awarded tracts, and it ordered that
additional survey work be performed and Coles and Kettrick to each pay 50% of
the costs associated with this work. 
Finally, the trial court ordered that the Kettricks, the Cupits, and
Tate remove any personal items from Coles’s property no later than August 31,
2010.  

The trial court subsequently entered
findings of fact and conclusions of law. 
It found that on March 9, 2010, the parties had reached a “tentative
settlement agreement” at Haley’s office that “contemplated” that Coles would
concede the Spring House along with one or two surrounding acres to Fred
Kettrick and Fred Kettrick would concede the same amount of acreage to Coles on
the north/south boundary of their two tracts; the parties then traveled to the
property to stake the boundaries; the parties, at the property, made one
additional change to the agreement; and Fred Kettrick conceded a pie-shaped
piece of property along the north side of his tract instead of along the
western boundary of Coles’s track.  The
trial court further found that at the time the parties left the property, Fred Kettrick
knew that Haley understood the case to be settled on the above terms, Rhonda Cupit
subsequently called Haley concerning the placement of surveyor pins, Kettrick
did not communicate again with Haley, and, on March 10, 2010, Haley and Clover
memorialized the terms of the parties’ settlement in the Rule 11 Agreement.  

The trial court concluded that the
Rule 11 Agreement was an enforceable contract and settlement agreement and,
thus, Coles’s claims for breach of contract and specific performance were
meritorious.  It further concluded that Haley
had apparent authority to bind his clients[6] to
the Rule 11 Agreement, Haley’s clients actually authorized him to sign the Rule
11 Agreement, and Haley had actual authority to bind his clients to the Rule 11
Agreement. 

Standard of Review

In an appeal of a judgment rendered
after a nonjury trial, a trial court’s findings of fact have the same weight as
a jury’s verdict, and we review the legal and factual sufficiency of the
evidence used to support them just as we would review a jury’s findings. Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994); Daniel v. Falcon Interest
Realty Corp., 190 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, no
pet.).  In conducting a legal sufficiency
review of the evidence, we must consider all of the evidence in the light most
favorable to the verdict and indulge every reasonable inference that would
support it.  City of Keller v. Wilson, 168 S.W.3d 802,
822 (Tex. 2005). In determining whether legally sufficient evidence supports
the finding under review, we must consider evidence favorable to the finding,
if a reasonable fact finder could consider it, and disregard evidence contrary
to the finding, unless a reasonable fact finder could not disregard it.  Id.
at 827; Brown v. Brown, 236 S.W.3d
343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  However, if the evidence at trial would enable
reasonable and fair-minded people to differ in their conclusions, then jurors must
be allowed to do so.  City of Keller, 168 S.W.3d at 822; see also King Ranch, Inc. v. Chapman,
118 S.W.3d 742, 751 (Tex. 2003). When a party attacks the legal sufficiency of
an adverse finding on which it did not have the burden of proof, it must demonstrate
that there is no evidence to support the adverse finding.  Croucher
v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Bellino v. Comm’n for Lawyer Discipline, 124 S.W.3d 380, 385 (Tex.
App.—Dallas 2003, pet. denied).  We will sustain a legal sufficiency
or “no evidence” challenge if the record shows one of the following: (1) a
complete absence of evidence of a vital fact, (2) rules of law or evidence bar
the court from giving weight to the only evidence offered to prove a vital
fact, (3) the evidence offered to prove a vital fact is no more than a
scintilla, or (4) the evidence establishes conclusively the opposite of the
vital fact.  City of Keller, 168 S.W.3d at 810.

In reviewing a factual sufficiency
challenge, we consider and weigh all of the evidence supporting and
contradicting the challenged finding and set aside the finding only if the
evidence is so weak as to make the finding clearly wrong and manifestly unjust.
 Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); see Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).
 When a party attacks the factual
sufficiency of an adverse finding on an issue on which it did not have the
burden of proof at trial, it must show that there is insufficient evidence to
support the adverse finding.  Vongontard v. Tippit, 137 S.W.3d 109,
112 (Tex. App.—Houston [1st Dist] 2004, no pet.).

We review a trial court’s conclusions
of law de novo, and we will uphold the conclusions if the judgment can be
sustained on any legal theory supported by the evidence.  BMC
Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002); In re Moers, 104 S.W .3d 609, 611 (Tex.
App.—Houston [1st Dist.] 2003, no pet.).  Although a trial court’s conclusions of law
may not be challenged for factual sufficiency, we may review the legal
conclusions drawn from the facts to determine whether the conclusions are
correct.  BMC Software Belgium, N.V., 83 S.W.3d at 794; Holloway–Houston, Inc. v. Gulf Coast Bank & Trust Co., 224
S.W.3d 353, 357 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  If we determine that a conclusion of law is
erroneous, but that the trial court nevertheless rendered the proper judgment,
the error does not require reversal.  BMC Software Belgium, N.V., 83 S.W.3d at
794.

Finally, we note that the trial court
acts as fact-finder in a bench trial and is the sole judge of the credibility
of witnesses.  See Murff v. Murff, 615 S.W.2d 696, 700 (Tex. 1981); HTS Servs., Inc. v. Hallwood Realty
Partners, L.P., 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no
pet.).

Actual Authority

In their first issue, the Kettricks
argue that the trial court erred in concluding that Haley had actual authority
to bind them to the Rule 11 Agreement because Rhonda Cupit told Haley that he
was not authorized to enter into a settlement agreement, the Rule 11 Agreement
was signed on behalf of all of Haley’s clients but only Fred Kettrick and
Rhonda Cupit were present at the settlement conference, Haley did not contact
his other clients, the Rule 11 Agreement contained provisions that the parties
did not discuss, Haley agreed that his clients did not “affirmatively
authorize[]” him to enter into the Rule 11 Agreement, and Haley’s letter, with
the attached Compromise and Settlement Agreement, contained statements
“inconsistent with an attorney who thought he was authorized to sign” the Rule
11 Agreement.   

“Generally, a court will indulge
every reasonable presumption to support a settlement agreement made by a duly
employed attorney.”  Ebner v. First State Bank of Smithville, 27 S.W.3d 287, 300 (Tex.
App.—Austin 2000, pet. denied); see also Breceda
v. Whi, 187 S.W.3d 148, 152 (Tex. App.—El Paso 2006, no pet.) (“Generally,
within these roles, every reasonable presumption is to be indulged in favor of
the attorney duly employed.”); Behzadpour
v. Bonton, No. 14-09-01014-CV, 2011 WL 304079, at *3 n.2 (Tex. App.—Houston
[14th Dist.] Jan. 27, 2011, no pet.) (mem. op.) (“An attorney retained for
litigation is presumed to possess actual authority to enter into a settlement
on behalf of a client.”).  However, this
presumption may be rebutted by “affirmative proof that the client did not
authorize his attorney to enter into the settlement.”  City of
Roanoke v. Town of Westlake, 111 S.W.3d 617, 629 (Tex. App.—Fort Worth
2003, pet. denied). When the evidence demonstrates that the attorney did not
have the authority to enter into the settlement agreement, the agreement will
not be enforced.  Ebner, 27 S.W.3d at 300; see
also Kelly v. Murphy, 630 S.W.2d 759, 761 (Tex. App.—Houston [1st Dist.]
1982, writ ref’d n.r.e.) (noting that presumption that attorney is acting within
authority given by client is rebuttable); Sw.
Bell Tel. Co. v. Vidrine, 610 S.W.2d 803, 805 (Tex. Civ. App.—Houston [1st
Dist.] 1980, writ ref’d n.r.e.) (stating that “mere employment of counsel does
not clothe the counsel with authority to settle the cause without specific
consent of the client”).

A party may clothe his attorney with
either actual or apparent authority to reach and sign a binding settlement
agreement.  W. Beach Marina, Ltd. v. Erdeljac, 94 S.W.3d 248, 255 (Tex. App.—Austin
2002, no pet.); see also Ebner, 27 S.W.3d at 300 (“To establish
authority, the principal must make some manifestation to the agent (actual
authority) or to a third party (apparent authority) that he is conferring such
authority.”). Actual authority is authority that the principal intentionally
conferred on the agent or allowed the agent to believe was conferred.  City of
Roanoke, 111 S.W.3d at 627; Ebner,
27 S.W.3d at 300; see also Behzadpour, 2011 WL 304079, at *3 (“Actual
authority is created through written or spoken words or conduct of the
principal communicated to the agent.”).  Actual
authority includes both express and implied authority and “usually denotes that
authority a principal (1) intentionally confers upon an agent, (2)
intentionally allows the agent to believe that he possesses, or (3) allows the
agent to believe that he possesses by want of due care.[7]  Spring
Garden 79U, Inc. v. Stewart Title Co., 874 S.W.2d 945, 948 (Tex. App.—Houston
[1st Dist.] 1994, no writ).  Implied
actual authority is an “adjunct” to express actual authority, “because implied
authority is that which is proper, usual, and necessary to the exercise of the
authority that the principal expressly delegates.”  Id.

In reviewing the sufficiency of the
evidence to support the trial court’s findings of fact that pertain to Haley’s
actual authority and the trial court’s conclusion of law that Haley possessed
actual authority, we consider the testimony provided by Coles, Fred Kettrick,
Haley, and Cupit.  Coles testified that
she, her husband, and her attorney met with Fred Kettrick, Rhonda Cupit, and
their attorney to settle the dispute, which had arisen over the proposed award
to her of a tract of land that contained both the Spring House and the Old House.  In order to settle the dispute, she agreed to
give Kettrick the Spring House with surrounding acreage in exchange for an
equal amount of acreage.  The parties met
at the property and agreed to the acreage to be exchanged.  Coles confirmed that the Rule 11 Agreement
accurately represented the parties’ agreement, and although she did not know if
the parties had discussed the removal of personal items from the property, she noted
that the parties had already divided the items. 

Haley testified that Fred Kettrick,
Rhonda Cupit, and the Coles agreed to the boundaries of the tracts to be
exchanged, Fred Kettrick and Rhonda Cupit confirmed their agreement, and Haley
was “convinced” that his clients had agreed to the stated terms.  Haley denied that Cupit had instructed him to
change the terms or withdraw from settlement, and he only learned some “weeks
later” that Fred Kettrick disputed the Rule 11 Agreement.  Haley also explained that it was normal
practice to negotiate settlements for “husband and wife.”  Although Haley conceded that he did not
specifically discuss the Rule 11 Agreement with his clients, he noted that the
parties had agreed on the property division, had engaged in “some discussion”
of the survey fees, and there was “already a deal” on the personal property
provision, which was simply an extension of time for the parties to remove the
property.

Fred Kettrick also agreed that the parties
met for settlement purposes and that, at the time the parties traveled to the
property, he thought there was “possibly” an agreement.  Although Kettrick asserted that a dispute had
developed over Coles’s “makeup acreage,” he agreed that, at the conclusion of
the parties’ meeting, Coles “probably” understood that the parties had reached
a settlement, he did not say anything “to make [Coles] think that the case
hadn’t been settled,” and he knew that even Haley believed that the case had
been settled.  Moreover, although Kettrick
testified that he subsequently asked Cupit to instruct Haley not to settle the
dispute, he agreed that he did not have personal knowledge of what Cupit had told
Haley and he had not spoken to Haley since the settlement discussions.  Kettrick denied that he had authorized Haley
to sign the Rule 11 Agreement or the parties had discussed additional survey fees
or the removal of personal items from the property.  However, he agreed that he was aware that,
after leaving the property, the attorneys were “going to draw some papers up.”    

Cupit testified that the parties had
only discussed a possible agreement, she did not authorize Haley to sign the
Rule 11 Agreement, she had not discussed additional survey fees, and she did
not engage in any detailed discussion about the removal of personal items from
the property.  Cupit stated that, following
the parties’ property visit, she informed Haley in a telephone call that Fred
Kettrick was “very upset” and that the survey lines were not correct.  Cupit also stated that she would not have
entered into a settlement agreement that lacked a right of first refusal.  

Viewing the evidence in a light most
favorable to the verdict, we conclude that the record contains sufficient evidence
that would have permitted the trial court to conclude that Haley had actual
authority to execute the Rule 11 Agreement on behalf of his clients and, thus,
that the agreement was enforceable on this basis.  In regard to the critical disputed terms,
i.e., the property exchange provisions, Haley testified that Fred Kettrick
agreed to these terms, he was “convinced” his clients had agreed to the terms,
and he was never instructed that the terms had changed.  Coles similarly testified that the parties
had all agreed to the property exchange provisions.  Kettrick’s testimony also indicates that, at
the conclusion of the property visit, he knew that both Haley and Coles
believed that the dispute had been settled. 


In regard to the survey fees and the
removal of personal items from the property, Haley testified that the parties
had engaged in “some discussion on the fees” and the parties had already
reached a deal on the removal of personal items from the property.  Coles similarly testified that the parties
had already agreed to divide the personal items, and her testimony supports a
finding that the provision concerning the removal of personal items from the
property was simply a reflection of this prior agreement.  Moreover, although Kettrick and Cupit
presented some conflicting testimony, the trial court could have also noted
that there were inconsistencies in Kettrick’s and Cupit’s testimony regarding
the scope of the settlement discussions while at the property as well as the
matters discussed in Cupit’s subsequent telephone conversation with Haley.  The trial court also could have inferred from
Kettrick’s testimony about his instructions for Cupit to call Haley that the
parties had, in fact, already reached an agreement. 

In sum, we conclude that there is
more than a scintilla of evidence to show that Kettrick conferred actual
authority upon Haley to settle the dispute and execute the Rule 11 Agreement
or, alternatively, that Kettrick allowed Haley to believe that actual authority
had been conferred.[8]  See City of Roanoke, 111 S.W.3d at 629; see also Cadle Co. v. Morgan, No.
01-03-01020-CV, 2005 WL 856901, at *4 (Tex. App.—Houston [1st Dist.] Apr. 14,
2005, no pet.) (mem. op.) (holding that there was sufficient evidence to
support trial court’s finding that attorney possessed actual authority to
settle case).  We further conclude that
the evidence is not so weak as to make the trial court’s findings clearly wrong
and manifestly unjust. Accordingly, we hold that the evidence is legally and
factually sufficient to support the trial court’s findings regarding Haley’s
actual authority to settle the dispute by executing the Rule 11 Agreement.  We further hold that the evidence is legally
sufficient to support the trial court’s conclusion that Haley had actual
authority to execute the Rule 11 Agreement and the trial court did not err in
enforcing the Rule 11 Agreement.  

We overrule the Kettricks’ first
issue.[9]

 

Conclusion

          We
affirm the judgment of the trial court.            

                                      

 

Terry Jennings

Justice

 

Panel consists of Justices Jennings, Bland,
and Massengale.











[1]               See Tex. R. Civ. P. 11 (“Unless otherwise
provided in these rules, no agreement between attorneys or parties touching any
suit pending will be enforced unless it is in writing, signed and filed with
the papers as part of the record, or unless it be made in open court and
entered of record.”) .

 





[2]           Rhonda Cupit is Fred Kettrick’s
daughter.

 





[3]           Rhonda and Greg Cupit and Evelyn Tate,
who were defendants in the underlying suit, have not appealed the trial court’s
judgment.  It is undisputed that Tate
held only a mineral interest in the property.





[4]           Although a court may not render an
agreed judgment absent consent of the parties at the time the judgment is
rendered, the court may nevertheless enforce a settlement agreement that complies with rule 11 as a contract, even
after one party has withdrawn its consent. 
City of Roanoke v. Town of
Westlake, 111 S.W.3d 617, 626 (Tex. App.—Fort Worth 2003, pet. denied).

 





[5]           The trial court limited the bench
trial to this claim pursuant to a
motion to bifurcate filed by the Kettricks, and it stated that it would conduct
a trial on the partition matter, if necessary.





[6]           In its findings and conclusions, the
trial court generally referred to the “Defendants,” but it identified the
Kettricks, the Cupits, and Tate all as defendants at various points.  It also noted that Greg Cupit, Judy Kettrick,
and Floyd Tate “were joined to this cause to the extent that they may have a
homestead interest in their respective spouses’ undivided interest” in the
property.





[7]               In
contrast, apparent authority exists when conduct by a principal leads a reasonable
third party to believe that an agent has the authority that he purports to exercise.  Ebner
v. First State Bank of Smithville, 27 S.W.3d 287, 300 (Tex. App.—Austin
2000, pet. denied).  Apparent authority
may also arise when the principal shows such a lack of ordinary care as to
clothe the agent with an indicia of authority. 
Id.

 





[8]           The Kettricks make a number of
arguments concerning whether third parties, who are not parties to this appeal,
actually authorized Haley to execute the Rule 11 Agreement on their
behalf.  Because those parties have not
appealed the judgment as it relates to them, we do not consider these
arguments.  To the extent that Fred
Kettrick argues that Haley was not authorized by his wife to enter the Rule 11
Agreement, Haley’s evidence supports a finding that he was actually authorized
by all of his clients, including the Kettricks, to enter into the Rule 11
Agreement.   

 





[9]           Having held that the trial court did
not err in enforcing the Rule 11 Agreement on the basis of actual authority, we
need not consider the Kettricks’ second issue, in which they challenge the
trial court’s findings and conclusions pertaining to Haley’s apparent
authority.